<u>**NOT FOR PUBLICATION**</u>          [Docket Nos. 156, 160 and 184]

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

JAMES HARRIS,

          Plaintiff,

     v.                          Civil No. 03-2002(RMB)

STATE OF NEW JERSEY, ET AL.,

          Defendants.          **OPINION**


Appearances:

Louis P. McFadden, Jr., Esquire
2106 New Road
Linwood Commons, Suite F-4
Linwood, New Jersey 08221
(609) 601-2330
    Attorney for Plaintiff

Michael H. Freeman, Esquire
Greenberg, Dauber, Epstein & Tucker, PC
One Gateway Center, Suite 600
Newark, New Jersey 07102-5311
(973) 643-3700
    Attorney for Defendants


**BUMB**, United States District Judge:

THIS MATTER comes before the Court upon the Defendants'

motion for summary judgment.  Defendants have moved for summary

judgment as to all counts of the Complaint, but after extensive

briefing, Plaintiff has conceded many of his claims.

Initially, Plaintiff alleged the following:

1

The first count was asserted against all Defendants, including the New Jersey State Police, Attorney General Stuart Rabner in his official capacity, and Superintendent Rick Fuentes in his official capacity:

•    Count 1, violation of Plaintiff's Fourth Amendment and Fourteenth Amendment rights.

The remaining claims (Counts 2-8) were asserted against Staff Sergeant Bryan McCoy ("Ssgt. McCoy") and Lieutenant Charles Noreiko ("Lt. Noreiko") (both of whom supervised Plaintiff at Bass River station), Major Daniel Cosgrove ("Maj. Cosgrove") and Sergeant Thomas Flarety ("Sgt. Flarety") (both of whom investigated an anonymous complaint made against Plaintiff at Woodbine station), and Major Glenn Miller ("Maj. Miller") (who was a Troop Commander overseeing Plaintiff at Woodbine):

•    Count 2, violation of 18 U.S.C. §§ 1985(2)

•    Count 3, violation of 18 U.S.C. § 1985(3)

•    Count 4, violation of 18 U.S.C. § 1986

•    Count 5, violation of the Conscientious Employee Protection Act, known as CEPA, N.J.S.A. § 34:19-1

•    Count 6, violation of public policy

•    Count 7, violation of state constitutional rights

•    Count 8, claim for intentional infliction of emotional distress.

    In his opposition papers, Plaintiff conceded or withdrew

most of his claims.  Thus, the following claims are now before the Court:

- Count 1 (§ 1983 claims - based on the Fourth Amendment and Equal Protection)[1]

- Count 5 (CEPA claim)

- Count 7 (state constitutional claim based on violations similar to Count 1).

I. **FACTS**[2]

**General Background**

Plaintiff James Harris graduated from the State Police Academy in January 1986.  (Pl. SOF at ¶ 1; Def. SOF at ¶ 1).  His initial assignment was as a Trooper at the Woodbine State Police Station.  (Def. SOF at ¶ 1).  During the 1990s, Plaintiff received promotions to Trooper II, Trooper I, and Assistant Squad Supervisor; he also received transfers to different state police stations, which enabled Plaintiff to obtain varied experiences and to work with different personnel.  (Def. SOF at ¶ 1; Pl. SOF at ¶ 2).  In the early 1990s, Plaintiff requested and received a

---

[1] In addition to the alleged violations of the Fourth and Fourteenth Amendment, Plaintiff also seeks to include in Count 1 an alleged violation of the First Amendment.  This will be discussed below.

[2] The facts are derived from the parties' Rule 56.1 Statements of Fact ("SOF"), their exhibits and their motion papers.

transfer to Bass River Station and several years later, he requested and received a transfer back to Woodbine. (Def. SOF at ¶ 1).

**<u>Plaintiff's Complaints Concerning Promotions</u>**

During 2000 and 2001, Plaintiff was one of more than one hundred Trooper I candidates who were being considered for promotion to sergeant within Troop A (covering the southern New Jersey region) and Troop E (responsible for the Garden State Parkway). (<u>Id.</u> at ¶ 2). In March 2000, there were 16 vacant sergeant spots, but Plaintiff was not promoted. (<u>Id.</u> at ¶ 3). In September 2001, there were three vacancies for sergeant but, again, Plaintiff was not promoted. (<u>Id.</u> at ¶ 8).

In response to these failures to be promoted, Plaintiff filed a series of Special Reports and grievances complaining about the Troopers who were promoted and the general promotional system. (Pl. SOF at ¶ 3). Plaintiff's first Special Report was made on February 4, 2000, and similar reports were filed on May 21, 2000, December 29, 2000, and February 9, 2001. (<u>Id.</u>; Pl. Exs. 1A, 1C, 1D). In these reports, Plaintiff requested to see the Troop A Commander "in reference to career development" and to "discuss [his] current ranking and the current promotional system." (Pl. Exs. 1A, 1C, 1D). Specifically, in his December 29, 2000 Special Report, Plaintiff complained about the appointment of another trooper as Squad I Bellmawr Acting Squad

4

Supervisor, stating that the appointment was not in compliance with "the Attorney General's 1st and 2nd report on the State Police as it relates to disparate treatment and the promotional system." (Pl. Ex. 1A). Similarly, Plaintiff's February 9, 2001, grievance complained about another trooper's assignment to the Port Norris Acting Squad Supervisor. (Id.).

In addition to filing complaints, Plaintiff, after being denied a promotion in March 2000, approached Defendant Maj. Miller, Troop A Commander, to ask how he could improve his ranking to better his chances of being promoted during the next promotional opportunity. (Id. at ¶ 4). Plaintiff asked "what I need[ed] to do to try to get promoted." (Harris Dep. I, 58:17-18; see also 71:24 to 72:10). Plaintiff conceded that he was not interested in the promotional opportunities for anyone else or the promotional system in general; rather he admitted that he only "wanted to talk about [him]self." (Harris Dep. I, 59:24; see also Miller Dep. 65:7-19). Maj. Miller explained to Plaintiff, as well all of the other candidates who similarly approached him to ask how they could get promoted, that the best candidates were those who had demonstrated significant achievement at their current position, shown initiative, and evidenced that they could handle the responsibilities of the new position. (Def. SOF at ¶ 6).

**Internal Investigation relating to Trooper Oliva**

In or about the end of 2000, New Jersey State Trooper John Oliva filed an internal complaint with the state police alleging that he was the victim of harassment at the Woodbine station. (Def. SOF at ¶ 69).  Oliva alleged that he was harassed after he refused to engage in racial profiling with his trooper coach. (<u>Id.</u>).  The alleged harassment consisted of threatening anonymous notes and tampering with his personal property.  (<u>Id.</u>).  Oliva claimed that the harassment was performed by members of the "Lords of Discipline," an alleged group of state police troopers that purportedly harassed and intimidated other troopers.

In his Statement of Undisputed Facts, Plaintiff Harris describes the Lords of Discipline as a group that "would 'take the law into their own hands,' so to speak, and impose discipline..." (Pl. SOF at ¶ 13).  Plaintiff relies upon a Task Force Report conducted by New Jersey State Police that revealed conduct in the form of hazing and other harassment upon Troopers who failed to conform to certain customs and practices of the State Police.  He further introduces deposition testimony of "[p]ersons in high ranking positions with the New Jersey State Police [who] admitted knowledge of a sub-culture of New Jersey State Trooper[s], including supervisory personnel, who had a reputation of imposing discipline in the form of hazing and harassment of other Troopers, for the purpose of imposing both

6

conformity to perceived customs and practices, as well as meting out punishment to those who failed to conform." (Id.).

Plaintiff alleges, in an affidavit, that in April 2001 he was identified as a "witness" in the internal investigation of complaints filed by Trooper Oliva, and on April 9, 2001, he was contacted by phone and advised that he was being upgraded to a principal witness. (Id. at ¶¶ 14-15). The only evidence of this is from the Plaintiff's affidavit. On May 11, 2001, Oliva filed a federal complaint, and Harris was named as one of the trooper defendants. (Freeman Decl. Ex. 24). Lt. Gayle Cameron and Capt. Debra Armitage with the Office of Professional Standards ("OPS") conducted the Oliva investigation and notified each of the alleged harassers, including Plaintiff, that they would be interviewed, although the date is not in the record. (Def. SOF at ¶ 70).

OPS interviewed Plaintiff and several others on July 30, 2001, more than a week after Plaintiff had been informed that the results of his urine test (described infra) were negative. (Id.). During the interview, Plaintiff denied harassing Oliva and denied ever having any personal knowledge even relating to the purported harassment. (Id.). In fact, Plaintiff admits that the first time he learned about the alleged harassment of Oliva was either when he read a newspaper story concerning the allegations or during the OPS interview, by virtue of the

questions.  (Harris Dep. I, 193:9-195:21).

### Plaintiff Tested for Drug Use

On or about July 11, 2001, an anonymous phone call was made
to the State Police hot line.  (Freeman Decl. Ex. 22; Def. SOF at
¶ 61).  The caller stated that the prior weekend, he had
witnessed Plaintiff smoking marijuana at a backyard barbeque
party in Ocean City, New Jersey.  (Id.).  The caller also
described Plaintiff as being short, having a stocky build and
blondish-brown hair, a description that Plaintiff does not
dispute as inaccurate.  (Id.).  The evidence is undisputed that
Plaintiff resides in Ocean City and was off duty during the
weekend of July 7-8, 2001.  (Id.).  Plaintiff listened to the
tape recording of the anonymous call and did not recognize the
voice, nor did he believe that any of the Defendants had made the
call.  (Harris Dep. I, 234:17-22; Def. SOF at ¶ 62).

Captain Meddis, in charge of the intake unit at OPS that
received the telephone complaint, found that reasonable suspicion
existed to warrant a urine test.  (Def. SOF at ¶ 64).  Major
Brennan concurred with that recommendation, which was then
presented to State Police Superintendent Col. Carson Dunbar for
approval.  (Id.).  Col. Dunbar agreed that reasonable suspicion
existed and ordered Captain Meddis to have a urine test conducted
of the Plaintiff.  (Id.).  Captain Meddis contacted Defendant Lt.
Cosgrove, an OPS investigator, and directed him to investigate

whether Plaintiff had illegally used marijuana, beginning with
conducting a urine test.  (<u>Id.</u>).  Lt. Cosgrove requested
Defendant Det. Sgt. Thomas Flarety to assist him in the
investigation.  (<u>Id.</u>).

Lt. Cosgrove and Sgt. Flarety followed their superiors'
orders and conducted the investigation.  (<u>See</u> Freeman Decl. Exs.
22, 30; Cosgrove Dep., 37:15-38:5).  Lt. Cosgrove contacted the
Plaintiff to schedule the urine test and both he and Sgt. Flarety
traveled to Plaintiff's home to obtain the urine sample, which
Plaintiff provided.  (Def. SOF at ¶ 65).  Lt. Cosgrove and Sgt.
Flarety advised Plaintiff that the urine test results would be
obtained within fifteen (15) days.  (<u>Id.</u>).  Within approximately
eight (8) days, Plaintiff was notified that the test results were
negative.  (<u>Id.</u>).

Because of the negative test results, Lt. Cosgrove suggested
to Chief State Investigator Dorn and Major Brennan that the
investigation be closed as the only evidence that supported the
accusation was the anonymous complaint.  (<u>Id.</u> at ¶ 67).  Both
Chief Dorn and Major Brennan disagreed with that suggestion and
directed Lt. Cosgrove to complete the investigation by
interviewing Plaintiff, which is standard procedure in
investigations.  (<u>Id.</u>).  Defendants Cosgrove and Flarety followed
that order and interviewed the Plaintiff.  (<u>Id.</u> at ¶ 68).  During
Plaintiff's ten minute interview, he admitted that he was in

9

Ocean City during the weekend in question, but denied attending
any backyard party and denied smoking marijuana.  (Id.).  That
interview concluded the investigation and Lt. Cosgrove then
recommended that the investigation be dismissed.  (Id.).  Captain
Meddis accepted that recommendation and dismissed the
investigation.  (Id.).

### Filing of EEO complaint

On July 19, 2001, a week after providing a urine sample,
Plaintiff filed a complaint with the state police EEO-Affirmative
Action office, complaining that the anonymous complaint would
harm his chances of promotion to sergeant.  (Freeman Decl., Ex.
25).  The EEO informed Plaintiff that it could not investigate
his allegations because he did not allege discrimination based on
a protected characteristic, such as race, age, or religion.
(Harris Dep. I, 157:1-158:5).

### Plaintiff's Transfer to Bass River and Subsequent Performance

On or about November 17, 2001, the six squads at Woodbine
were consolidated into four, which caused Plaintiff and some
other supervisors to be redesignated from assistant squad
supervisor back to Trooper I.  (Harris Dep. I, 104:5-22, 106:12-
19; Harris Dep. III, 12:8-13:13).  On November 19, 2001,
Plaintiff was notified that he was being transferred from
Woodbine back to Bass River to be promoted to sergeant.  (Def.

SOF at ¶ 10).  On or about December 1, 2001, Plaintiff was transferred to Bass River, where he assumed the role of acting sergeant on squad 3.  (Id. at ¶ 12).  Six weeks later, the State Police formally promoted Plaintiff to sergeant.  (Id. at ¶ 13).

Defendant Ssgt. McCoy initially served as Plaintiff's immediate supervisor at Bass River; Defendant Lt. Noreiko was the Bass River station commander.  (Id. at ¶ 17).  Upon Plaintiff's transfer to Bass River, Ssgt. McCoy offered to supervise Plaintiff because he and Plaintiff had been friends during the early 1990s when they were both stationed at Woodbine.  (Id.).

During the first quarter of 2002, Ssgt. McCoy verbally noted to Plaintiff some errors Plaintiff had made and suggested ways for him to improve.  (Def. SOF at ¶ 22).  In May and June 2002, Ssgt. McCoy handed Plaintiff four Performance Notices ("PN") to inform Plaintiff of various errors made or rules to be followed.  (Id.)  The parties dispute whether or not a PN is a disciplinary/punitive measure.  (Def. SOF at ¶ 19).  Plaintiff disputed each PN he received by filing a union grievance.  (Id.¶ 28).  The hearing officer who considered the grievances filed by the Plaintiff found that each PN was warranted and justified as "a tool used to enhance the subordinate's development, not to overburden or demean," and summarized his findings as follows:

> As a result of the review of these four performance
> notices, I find that they are issued in the manner of
> being used as a tool to provide Sgt. Harris with the
> proper procedure to handle delegated tasks, provide the

11

> chain of command with accountable information as to
> shift changes and intentions of leaving the station,
> and the importance of displaying a professional
> attitude towards the public and other law enforcement
> agencies.  As a supervisor, Sgt. Harris should learn
> from these performance notices to enhance his career
> development.

(Freeman Decl. Ex. 6).

Besides filing grievances in response to PNs, on a number of occasions following disagreements at work, Plaintiff immediately left the station, claiming he was ill, or called out sick the next work day(s).  (Def. SOF at ¶ 43; Freeman Decl. Exs. 10, 12, 13).  Ssgt. McCoy and Lt. Noreiko discussed Plaintiff's behavior and on May 13, 2002, they called Dr. Izzi, the state police's managing physician, to discuss Plaintiff's situation.  (Def. SOF at ¶ 48; Pl. SOF at ¶¶ 37-38; Pl. Ex. 27).  Plaintiff was then asked to meet with Dr. Izzi and he did so on May 14, 2002.  (Def. SOF at ¶ 48).  During the 30-45 minute discussion with Dr. Izzi, Plaintiff said that he had been calling out sick because he believed he was suffering from a hernia.  (Harris Dep. III, 139:3-10; 146:9-147:6; 152:11; Izzi Dep., 131:17-18).  Dr. Izzi instructed Plaintiff to see his doctor about his hernia complaint and told Plaintiff he could return to work.  (Harris Dep. III, 153:8-12).

After the meeting with Dr. Izzi, Plaintiff began filing grievances complaining about Ssgt. McCoy, which Defendants contend were without merit, and, in July 2002, Plaintiff was

transferred to a new squad within Bass River under the
supervision of Ssgt. Fromosky.  (Def. SOF at ¶¶ 50-54).  Ssgt.
Fromosky and Plaintiff got along well at first, but with time,
Ssgt. Fromosky began having similar problems with Plaintiff as
Ssgt. McCoy did, including Plaintiff's pattern of appealing PNs,
filing grievances, and calling out sick in response to any
criticism.  (Id. at ¶ 55).  In October 2003, Ssgt. Fromosky filed
a harassment complaint against Plaintiff, complaining that
Plaintiff's filing of grievances "ma[de] it impossible to provide
a safe harmonious environment for the Squad and d[id] not allow
[him] to properly supervise Sgt. Harris."  (Freeman Decl., Ex.
19; Def. SOF at ¶ 60).

Although Plaintiff became eligible for promotion to sergeant
first class in January 2003, Plaintiff was not promoted in 2003,
2004, or 2005.  (Def. SOF at ¶ 80).  The parties dispute
Plaintiff's ranking during this time – Plaintiff asserts that he
should have been ranked "towards the top of the pack" while
Defendants claim he was generally at or near the bottom of any
comparisons with other candidates.  (Id. at 80-84).  Plaintiff
remains a sergeant today.


II.  **PROCEDURAL HISTORY**

On May 1, 2003, Plaintiff filed a complaint in this Court.
[Dkt. No. 1].  On July 19, 2004, Plaintiff filed an Amended

Complaint.  [Dkt. No. 18].  In relevant part, the Amended
Complaint deleted the following claims that were initially
asserted in Count 1 (§ 1983) of the original Complaint:  the
right of free speech, right of association, right of due process
inherent in the provision of liberty interest of employment, and
liberty interest in reputation.  (Compl. at ¶ 31).  Additionally,
Plaintiff deleted Count 7 (slander) and Count 8 (libel), which
were initially part of the original Complaint.  (Id. at ¶¶ 47-
51).

On September 29, 2006, Plaintiff filed yet another amended
complaint that contained various changes not approved by the
Court.  [Dkt. No. 80].  On October 20, 2006, Plaintiff amended
the Complaint to substitute names of parties pursuant to Rule 25.
[Dkt. No. 92].  This final Second Amended Complaint named the
following defendants:  New Jersey State Police, Attorney General
Stuart Rabner (in his official capacity), Police Superintendent
Rick Fuentes (in his official capacity), Glenn Miller, Daniel
Cosgrove, Thomas Flarety, Charles Noreiko, Brian McCoy, and John
Doe(s).  Thereafter, as described above, Plaintiff dismissed
several of his claims in connection with the pending motion and,
thus, only the following claims remain:

• Count 1 asserted claims under 42 U.S.C. § 1983 –
  specifically, violations of the Fourth Amendment (illegal
  search and seizure), the Fourteenth Amendment (Equal

14

Protection), and Title VII;

- Count 5 asserted a claim under the New Jersey Conscientious Employee Protection Act (CEPA); and

- Count 7 asserted claims based on violations of the New Jersey Constitution.

### III. <u>**STANDARD OF REVIEW**</u>

Summary judgment shall be granted if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(c); <u>Hersh v. Allen Products Co.</u>, 789 F.2d 230, 232 (3d Cir. 1986).  A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." <u>See Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  A fact is "material" only if it might affect the outcome of the suit under the applicable rule of law.  <u>Id.</u>  Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. <u>Id.</u>  "In making this determination, a court must make all reasonable inferences in favor of the non-movant." <u>Oscar Mayer Corp. v. Mincing Trading Corp.</u>, 744 F. Supp. 79, 81 (D. N.J. 1990) (<u>citing Meyer v. Riegel Prods. Corp.</u>, 720 F.2d 303, 307 n.2 (3d Cir. 1983)).  However, "[w]hen opposing summary judgment, the nonmovant may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts

15

identified by the movant.'"   <u>Corliss v. Varner</u>, 2007 WL 2709661
at *1 (3d Cir. September 17, 2007) (quoting <u>Port Auth. of N.Y.
and N.J. v. Affiliated FM Ins. Co.</u>, 311 F.3d 226, 233 (3d Cir.
2003)).   "At the summary judgment stage the judge's function is
not...to weigh the evidence and determine the truth of the matter
but to determine whether there is a genuine issue for trial."
<u>Anderson</u>, 477 U.S. at 249.


**IV.   <u>ANALYSIS</u>**

    **A.   <u>Count 1 - Section 1983 Claims</u>**

        **1.   <u>Sovereign Immunity</u>**

    With respect to Count 1, Defendants argue that the State
Police and Defendants named in their official capacities, Fuentes
and Rabner, are entitled to Eleventh Amendment immunity.   The
Court agrees.   The Eleventh Amendment provides that, "[t]he
Judicial power of the United States shall not be construed to
extend to any suit in law or equity, commenced or prosecuted
against one of the United States by citizens of another State, or
by Citizens or Subjects of any Foreign State."   U.S. Const.
Amend. XI.   As a general proposition, a suit by private parties
seeking to impose a liability which must be paid from public
funds in a state treasury is barred from federal court by the
Eleventh Amendment, unless Eleventh Amendment immunity is waived
by the state itself or by federal statute.   <u>See e.g.</u>, <u>Edelman v.</u>

16

Jordan, 415 U.S. 651, 663 (1974).

The Eleventh Amendment protects states and their agencies and departments from suit in federal court regardless of the type of relief sought.  Pennhurst State School and Hospital v. Halderman, 465 U.S. 89, 100 (1984).  Similarly, absent consent by a state, the Eleventh Amendment bars federal court suits for money damages against state officers in their official capacities.  See Kentucky v. Graham, 473 U.S. 159, 169 (1985). Section 1983 does not override a state's Eleventh Amendment immunity.  Quern v. Jordan, 440 U.S. 332 (1979).  Sections 1915(e)(2)(B)(iii) and 1915A(b)(2) of Title 28 United States Code require this Court to dismiss this action if it "seeks monetary relief from a defendant who is immune from such relief."

In addition, neither states, nor governmental entities that are considered arms of the state for Eleventh Amendment purposes, nor state officers sued in their official capacities for money damages are deemed "persons" within the meaning of Section 1983. Will v. Michigan Dept. Of State Police, 491 U.S. 58, 64, 70-71 and n.10 (1989).  Thus, Plaintiff's claims against the State Police and Officers Fuentes and Rabner in their official capacities are barred by the Eleventh Amendment and are therefore dismissed.

Plaintiff argues that he is nonetheless entitled to injunctive relief against these entities.  However, other than a

17

general claim for relief, Plaintiff does not identify the
specific injunctive relief he seeks.  Moreover, the evidence
presented shows that Plaintiff has not been denied anything to
which he has been entitled.  Indeed, Plaintiff was promoted to
sergeant in early 2002.  In light of this evidence and the lack
of any specific request for injunctive relief, this Court finds
no reason to award Plaintiff any injunctive relief.  The Eleventh
Amendment therefore bars Plaintiff's claims against the State
Police, and Defendants Rabner and Fuentes.

### 2.   **Remaining Defendants**

The Court now turns to Plaintiff's claims asserted against
the remaining Defendants in their individual capacities:  Miller,
Cosgrove, Flarety, Noreiko, and McCoy.  Plaintiff has brought
claims against these individuals for violations of his civil
rights pursuant to 42 U.S.C. § 1983.  When bringing an action
under 42 U.S.C. § 1983, a plaintiff must satisfy a two-prong test
by showing  that: 1) the conduct complained of was committed by a
person acting under color of state law, and 2) the conduct
deprived that person of rights guaranteed by the United States
Constitution.  West v. Atkins, 487 U.S. 42, 48 (1988).

### a)   **Fourth Amendment Claim**

Plaintiff alleges that the actions of Defendants Cosgrove
and Flarety in obtaining a urine sample from Plaintiff
constituted an illegal search and seizure of Plaintiff in

violation of the Fourth Amendment.  Defendants argue that the
seizure was not illegal because they had the "reasonable
suspicion" required to compel a law enforcement officer to submit
to a urine test.  This Court finds that, based on the information
the State Police received, reasonable suspicion existed to compel
the urine test of Plaintiff.

Specifically, the State Police based the decision to take a
urine sample from the Plaintiff on the following information:  an
anonymous phone call received on July 11, 2001 that Plaintiff was
smoking marijuana at a family gathering in Ocean City, New Jersey
during the prior weekend; the caller specifically identified
Plaintiff by name and gave an accurate physical description of
Plaintiff; and the facts that Plaintiff resides in Ocean City,
New Jersey and was off duty during the time of the alleged
marijuana use.  Based on this information Captain Meddis
requested, and Major Brennon and Col. Dunbar approved, the taking
of a urine sample from Plaintiff.  Defendants Cosgrove and
Flarety were ordered to obtain the sample and they followed those
orders.  Because the Court finds that reasonable suspicion
existed, both the decision to take Plaintiff's urine sample and
the actual seizure of the sample were warranted and no
constitutional violation occurred.

Even if the Court found that no reasonable suspicion
existed, Plaintiff's claim still fails because Defendants

19

Cosgrove and Flarety are entitled to qualified immunity in this situation.  Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." <u>Mitchell v. Forsyth</u>, 472 U.S. 511, 526 (1985).  It calls for a multi-step analysis, considered in proper sequence.  <u>Saucier v. Katz</u>, 533 U.S. 194, 200 (2001).  First, the Court must determine if the facts, taken in the light most favorable to the injured party, show a constitutional violation.  <u>Id.</u> at 201.  Second, the Court must decide whether there was a reasonable mistake of fact or law that lead to the violation.  <u>Butz v. Economou</u>, 438 U.S. 478, 507 (1978).  In making this determination, the Court must consider whether the right violated was so clearly established that an objectively reasonable officer could not be mistaken that his conduct violated that right.  <u>Saucier</u>, 533 U.S. at 205-06.  An officer is entitled to qualified immunity for a constitutional violation if "a reasonable officer could have believed that his or her conduct was lawful, in light of the clearly established law and the information in the officer's possession." <u>Grayer v. Township of Edison</u>, 198 Fed. Appx. 203, 206 (3d Cir. 2006).

In this case, the evidence fails to establish a constitutional violation, as discussed above.  Even if it did, however, Defendants Cosgrove and Flarety acted reasonably by obtaining Plaintiff's urine sample.  There has been no evidence presented that Defendants Cosgrove and Flarety were involved in

20

the decision to obtain the sample or that they were doing anything other than following orders of their superiors.  At oral argument, counsel for Plaintiff argued that Cosgrove and Flarety should have contradicted or disobeyed their superiors' orders and should have conducted their own independent analysis of whether or not reasonable suspicion existed to obtain the urine sample.  This argument has no legal support.  Moreover, no evidence has been presented that these two officers had a basis to find a lack of reasonable suspicion.  Indeed, the evidence presented to the Court demonstrated that there was reasonable suspicion to conduct the urine testing.  This Court finds that Defendants Cosgrove and Flarety acted reasonably in following their superiors' orders and they are therefore entitled to qualified immunity.  The Fourth Amendment claim against Defendants Cosgrove and Flarety is therefore dismissed.

The Second Amended Complaint also alleges in the body of the Complaint, paragraph 23, that "defendant Dunbar approved and directed that defendant [sic] Cosgrove and Flarity [sic] go to plaintiff's residence and secure a urine sample for emergency analysis."  However, as set forth above, Col. Dunbar is not named as a Defendant in the final Second Amended Complaint.  Although Col. Dunbar was originally named as a defendant in his official capacity, Plaintiff dismissed such claim when he filed the final

Second Amended Complaint on October 20, 2006.[3]  [Dkt. No. 92].

Thus, Plaintiff's Fourth Amendment claim is dismissed as against all Defendants.

### b)   Equal Protection Claim

Defendants argue that Plaintiff's Equal Protection claim fails for three reasons:  Plaintiff is not a member of a protected class, Plaintiff cannot show that he was treated materially differently from any other similarly situated officers, and Plaintiff has no evidence that Defendants' treatment of him was based on an impermissible intention to discriminate.

There are two ways a plaintiff may establish an Equal Protection claim:

> when (1) he is a member of a protected class similarly situated to members of an unprotected class and was treated differently from the unprotected class, see Andrews v. City of Philadelphia, 895 F.2d 1469, 1478 (3d Cir. 1990) or (2) he belongs to a "class of one" and was intentionally treated differently from others similarly situated without any rational basis.  Village of Willowbrook v. Olech, 528 U.S. 562 (2000).

---

[3] The Court notes that Plaintiff's first version of the Second Amended Complaint, filed on September 29, 2006, (Dkt. 80) named Col. Dunbar in both his official and individual capacities. However, on October 10, 2006, the Court issued an Order (Dkt. 85) striking this complaint from the record specifically because it contained impermissible changes from the prior complaint, such as the addition of Col. Dunbar in his individual capacity. Plaintiff never sought leave to file an amended complaint thereafter to assert a claim against Col. Dunbar in his individual capacity.  As Defendants argue, Plaintiff's Second Amended Complaint filed October 20, 2006 serves as the final complaint.

<u>Cataldo v. Moses</u>, 2005 WL 705359 at *13 (D.N.J. March 29, 2005).

Plaintiff's inartfully drafted complaint fails to set forth a clear theory supporting his Equal Protection claim.  His brief in opposition to summary judgment is equally unhelpful.  However, in response to the Court's questioning during oral argument, counsel for Plaintiff argued that the Equal Protection claim is based on Plaintiff's membership in the following class:  "a group of persons who assert a complaint that constitutes an expression of freedom of speech and is not afforded – as a result of that is not afforded the equal protection of the law as compared to other Troopers who do not complain."  (Transcript of Oral Argument, November 16, 2007).  Additionally, Plaintiff's counsel referred the Court to Plaintiff's answers to Supplemental Interrogatories, where Plaintiff stated,

> I am a member of the protected class of persons who oppose, or participate in, claims of violations of Title VII.  Specifically, the Plaintiff's status as a witness or potential witness in the Title VII claim filed by deceased trooper Oliva protects me against retaliatory conduct and adverse employment actions by the Defendants.

(Freeman Decl., Ex. 31 at question 4).

Firstly, the Court notes that the "class" Plaintiff refers to is not a protected class, as it has none of the "traditional indicia of suspectness:  the class is not saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political

powerlessness as to command extraordinary protection from the majoritarian political process." <u>San Antonio Independent School Dist. v. Rodriguez</u>, 411 U.S. 1, 28 (1973).  Indeed, Alfred E. Ramey, Jr., Assistant Attorney General advised Plaintiff that he was not associated with any "protected class" in a letter dated August 8, 2002.  (Sec. Am. Compl. at ¶ 27).

Moreover, Plaintiff offers no evidence to show that he, as a member of this "class" of potential witnesses, was treated differently than other troopers who were not potential witnesses. Plaintiff fails to identify any similarly situated officers, as required to establish a difference in treatment.  In his affidavit, Plaintiff alleges that he "was the only State Trooper who did not receive two separate quarterly performance appraisals in 2003 prior to being ranked and rated for promotion[,]" but the record is bereft of any supporting evidence.  (Pl. Aff. at ¶ 16). Similarly, Plaintiff alleges that when he was "sent to Bass River to realize a promotional opportunity, those below [him] in ranking who remained at Woodbine were also promoted to Patrol Sergeant (Assistance Squad Leader) at the same time[,]" but again, he offers no evidence concerning these other troopers. (<u>Id.</u> at ¶ 15).  Even if Plaintiff did identify others who were promoted without having to leave Woodbine, "they would not be 'similarly situated' under these circumstances unless they had had complaints lodged against them" by supervisors, as Plaintiff

24

had.  Cataldo, 2005 WL 705359 at *18.  Thus, Plaintiff's equal protection claim fails under the traditional analysis.

Having denied Plaintiff's Equal Protection claim under the first theory, the Court will now consider the claim under the "class of one" theory, notwithstanding Plaintiff's failure to clearly invoke this argument (in either his complaint or his opposition to summary judgment).  Pursuant to the "class of one" theory set forth by the United States Supreme Court in Olech, "a plaintiff must allege that (1) the defendant treated him differently from others similarly situated, (2) the defendant did so intentionally, and (3) there was no rational basis for the difference in treatment."  Hill v. Kutztown, 455 F.3d 225, 239 (3d Cir. 2006); see also Mosca v. Cole, 217 Fed. Appx. 158, 164 (3d Cir. 2007).

As discussed above, Plaintiff has utterly failed to present any evidence of similarly situated individuals who were treated differently than Plaintiff.  This deficiency alone is sufficient to deny Plaintiff's Equal Protection claim.  See Cataldo, 2005 WL 705359 at *18 (denying Equal Protection claim where plaintiff failed to offer any proof of others similarly situated); see also Adams Parking Garage, Inc. v. City of Scranton, 33 Fed. Appx. 28, 32 (3d Cir. 2002) (unpublished, non-precedential) (same).

Without fulfilling the first element - identifying similarly situated employees who were treated differently than Plaintiff -

Plaintiff has no hope of fulfilling the second element - that defendants <u>intentionally</u> treated Plaintiff differently - or the third element - that there was no rational basis for the difference in treatment.  Moreover, Defendants have produced evidence (in the form of performance notices, evaluations, and rating sheets) demonstrating that Plaintiff's failure to be promoted was attributed to his own mistakes, issues, and low rankings.  (<u>See generally</u> Exhibits to Freeman Decl.). Plaintiff's attempt to rebut this evidence by his own unsupported self-serving affidavit is insufficient at the summary judgment stage.  <u>Corliss v. Varner</u>, 2007 WL 2709661 at *1 (3d Cir. September 17, 2007) ("[w]hen opposing summary judgment, the nonmovant may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant'") (quoting <u>Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co.</u>, 311 F.3d 226, 233 (3d Cir. 2003)); <u>cf. Jiminez v. All American Rathskeller</u>, 503 F.3d 247, 255 (3d. Cir. 2007) (fact that affiant failed, despite ample opportunity, to identify specific individuals who had the conversations alleged in his affidavit "sp[oke] volumes about the veracity of [his] affidavit").

    Based on the above analyses, this Court holds that Plaintiff's Equal Protection claim fails under both the traditional Equal Protection analysis and the class of one

theory.   Accordingly, Defendants are granted summary judgment on this claim.

### c)   First Amendment Claim

The parties dispute whether Plaintiff has pled a First Amendment claim.  Defendants argue that the pleadings do not set forth such claim.  (Def. Reply at 6).  However, Plaintiff, in his opposition, makes argument in support of a First Amendment claim as if its existence in the pleadings were undisputed.  (Pl. Resp. at 13-16).  To resolve this disagreement, the Court must, again, turn to the history of the pleadings.

The parties agree that Plaintiff's initial Complaint, filed on May 1, 2003 [Dkt. No. 1], contained a First Amendment claim in paragraph 31:

> The aforesaid actions of the defendants constitute
> violations of the plaintiff's rights and privileges
> under the Constitution of the United States, including,
> but not limited to, (a) his right of free speech; (b)
> his right of association; ...

(Compl. at ¶ 31).  However, on July 19, 2004, Plaintiff filed his First Amended Complaint [Dkt. No. 18] which did not include a First Amendment claim.  Rather, the relevant paragraph only asserts violations of the Fourth Amendment, the Fourteenth Amendment, and Title VII:

> The aforesaid actions of the defendants constitute
> violations of the plaintiff's rights and privileges
> under the Constitution of the United States, including,
> (a) the right to be free of unlawful search and seizure
> and (b) the right to equal protection under the law.
> In addition, the aforesaid actions constitute a

27

> violation of the plaintiff's right to be free from
> retaliation pursuant to 42 USC §2000e-3(a).

(First Am. Compl. at ¶ 32).[4]

More than two years later, on September 29, 2006, Plaintiff, without leave of the Court, filed a Second Amended Complaint that added, underline(inter alia), a First Amendment claim. (Dkt. No. 80 at ¶ 31). In response to this filing, Defendants alerted the Court by letter, dated October 3, 2006, that Plaintiff had improperly amended his complaint to include changes that were not approved by the Court, such as the addition of a First Amendment claim. (Dkt. No. 82 at 3). Plaintiff replied by letter, dated October 5, 2006, admitting the changes and explaining that the First Amendment claim was "inadvertently omitted" from the First Amended Complaint. (Dkt. No. 83 at 2-3). Plaintiff also stated that in light of the errors, he "would welcome the opportunity to file a formal motion to amend the complaint." (Id. at 3). On October 6, 2006, Defendants responded in another letter to the Court, arguing that the addition of a First Amendment claim at that point would prejudice Defendants because, based on the First Amended Complaint, they had been operating on the understanding

---

[4] The Title VII claim was similarly repeated in Plaintiff's Second Amended Complaint. (Sec. Am. Compl. at ¶ 32). However, in his opposition to summary judgment, Plaintiff admits that the inclusion of the Title VII claim was a mistake: "Paragraph 32 of the Second Amended Complaint inadvertently referred to 42 USC § 2000e-3(a), however, the plaintiff makes no claim under Title VII." (Opp. at 8) (emphasis added).

that Plaintiff had dropped his First Amendment claim.  (Dkt. No. 84 at 5).  Defendants further stated that "Plaintiff has now agreed to defendants' suggestion that plaintiff make a motion for leave to amend." (Id. at 7)

On October 10, 2006, this Court determined that Plaintiff had "improperly amended the Complaint without first requesting leave of Court, as required by Federal Rule of Civil Procedure 15..." and directed Plaintiff to file an amended complaint with only the changes the Court had approved at a prior hearing [Dkt. No. 77] and ordered [Dkt. No. 78].  (Order dated October 10, 2006 [Dkt. No. 85]) (emphasis added).  Plaintiff refiled his Second Amended Complaint, which did not contain a First Amendment claim, on October 20, 2006.  (Dkt. No. 92).

Thereafter, Plaintiff did not seek and has never sought leave to amend the Second Amended Complaint, presumably abandoning his intent to assert a First Amendment claim.[5]  In sum, the Second Amended Complaint does not contain a First Amendment claim.[6]  There has been no First Amendment claim since

_____

[5] Plaintiff presumably also abandoned his claim against Defendant Dunbar in his individual capacity.

[6] The Court notes that Plaintiff, in his opposition brief, claims that paragraph 32 of the Second Amended Complaint sufficiently alleges a First Amendment claim because it alleges that Defendants' actions "constitute a violation of plaintiff's right to be free from retaliation..." (Opp. at 13).  Plaintiff is mistaken –  no such language exists in paragraph 32 of the Second Amended Complaint; rather, that language is found in Plaintiff's first Second Amended Complaint which was stricken

July 19, 2004 and, therefore, this claim is not before the Court.[7]

    **B.**    <u>**Count 5 (CEPA Claim) and Count 7 (New Jersey State Constitutional Claims)**</u>

    This Court has granted summary judgment for all Defendants on the federal causes of action in this case brought pursuant to § 1983. Thus, the only remaining counts are state law claims for wrongful retaliatory action and violations of the New Jersey Constitution. Once the claims over which a district court has original jurisdiction have been dismissed, a court may decline to exercise jurisdiction over supplemental state claims unless extraordinary circumstances exist. 28 U.S.C. 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if - (3) the district court has dismissed all claims over which it has original jurisdiction");

---

from the record.

    [7] It is bewildering that at oral argument Plaintiff persisted in making the argument that the Second Amended Complaint contained a First Amendment claim. This directly contradicted Plaintiff's earlier admissions to the Court that the Second Amended Complaint omitted, albeit inadvertently, such claim and that he would file a motion for leave to amend. Even against this backdrop, and in the face of Defendants' current vigorous denial of the existence of a First Amendment claim, Plaintiff still did not file a motion for leave to amend, but chose to rest on his argument that the complaint stated a First Amendment claim. For the reasons above, the Court finds that there is no First Amendment claim in the current complaint. Of course, Plaintiff is not barred from filing a motion for leave to amend at this juncture. <u>See</u> Fed. R. Civ. P. 59(e).

see Hedges v. Musco, 204 F.3d 109, 123 (3d Cir. 2000) (upholding district court's decision to refuse to exercise supplemental jurisdiction over remaining state law claims).

Because the federal causes of action have been dismissed and there are no circumstances compelling this Court to retain jurisdiction, the state law claims will be dismissed without prejudice, and, pursuant to 28 U.S.C. 1367(d), the statute of limitations for Plaintiff to bring such claims in state court will be tolled for thirty days after the date of dismissal. Hedges, 204 F.3d at 123-24 (discussing tolling); L-3 Communs. Corp. v. Clevenger, 2004 U.S. Dist. LEXIS 17845 at *20 (E.D. Pa. Aug. 31, 2004) (stating that Plaintiff had 30 days to re-file in state court where court declined to exercise supplemental jurisdiction).

## IV. **CONCLUSION**

For the reasons discussed above, Defendants are entitled to summary judgment on Count 1 (§ 1983 claims based on the Fourth and Fourteenth Amendments).  Having dismissed the federal causes of action, the Court also dismisses the remaining state law claims (Counts 5 and 7) without prejudice.


Dated:  January 14, 2008            s/Renée Marie Bumb
                                    RENÉE MARIE BUMB
                                    United States District Judge